FILED
11/15/24 10:51 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | ) | Case No. 24-70299-JAD |
| | ) | |
| GUARDIAN ELDER CARE AT | ) | Chapter 11 |
| JOHNSTOWN, LLC, d/b/a | ) | |
| RICHLAND HEALTHCARE AND | ) | Related to ECF No. 852 |
| REHABILITATION CENTER, *et al.*, | ) | |
| | ) | |
| Debtors-in-Possession. | ) | |
| _____X | | |
| | ) | |
| ERIE ACQUISITION, LLC, *et al.*, | ) | |
| | ) | |
| Movants, | ) | |
| | ) | |
| -v- | ) | |
| | ) | |
| GUARDIAN ELDER CARE AT | ) | |
| JOHNSTOWN, LLC, d/b/a | ) | |
| RICHLAND HEALTHCARE AND | ) | |
| REHABILITATION CENTER, *et al.* | ) | |
| | ) | |
| Respondents. | ) | |
| _____X | | |

## MEMORANDUM OPINION

Pending before the Court is a motion filed by the movants (collectively, the "Cuarzo Landlords") styled as *The Cuarzo Landlords' Expedited Motion for Payment of Master Lease Obligations* (the "Motion to Compel").

The Motion to Compel is a core proceeding over which this Court has the requisite subject-matter jurisdiction to enter a final judgment pursuant to 28 U.S.C. §§ 157(b)(2)(A), 157(O) and 1334(b).

This matter concerns whether the *Master Lease*, under which Guardian Elder Care at Johnstown, LLC d/b/a Richland Healthcare and Rehabilitation Center and certain of its affiliates (collectively, the "<u>Debtors</u>") operate healthcare facilities for patient occupancy, ought to be classified as a lease for "residential" or "nonresidential" real property under § 365(d)(3) of the Bankruptcy Code. Although the distinction may appear straightforward, it carries important implications for the parties' respective rights and obligations in this case.

Upon thorough examination of the relevant statutory language, case law, and the individualized circumstances of this case, this Court concludes that the *Master Lease* qualifies as a lease with respect to real property that can be deemed "residential" in nature for purposes of § 365(d)(3). As such, this provision of the Bankruptcy Code which only provides relief to "nonresidential" landlords does not impose any immediate payment obligations on the Debtors. Accordingly, the Court will issue an order denying the Motion to Compel.

## I.
## <u>BACKGROUND</u>

The Cuarzo Landlords, a consortium of property-owning entities under a real estate investment trust, entered into a *Master Lease* agreement[1] with the Debtors (who are identified in Schedule 1B to the *Master Lease*). Pursuant to the *Master Lease*, the Debtors operate several personal care homes and skilled nursing facilities located in Pennsylvania. A fair reading of the *Master Lease* is

---

[1] The *Master Lease* Agreement is attached as Exhibit 1 to the *Declaration of Heather Andrews*, filed at ECF No. 610-1. The *Declaration* itself and the *Master Lease* are both part of Exhibit 1 of the Cuarzo Landlords' Motion to Compel, filed at ECF No. 610.

that the parties have agreed the primary intended use of the leased premises is that they are facilities where patients (i.e., the Debtors' customers) reside and receive care.

Specifically, through its facilities, the Debtors provide skilled nursing, long-term care, and rehabilitation services. See *Declaration of Allen D. Wilen in Support of First Day Motions for Relief* at para. 8, ECF No. 35. As of the filing of the Motion to Compel, the facilities relevant to the interests of the Cuarzo Landlords had 1,143 resident beds, and had approximately 950 patients who actually resided at the facilities. See *Declaration of Allen D. Wilen in Support of the Cuarzo Portfolio Debtors' Objection to the Cuarzo Landlords' Expedited Motion for Payment of Master Lease Obligations* at para. 6, ECF No. 805-1.

The Debtors filed their petition for relief under chapter 11 of the United States Bankruptcy Code on July 29, 2024, with the stated goal of either selling or otherwise transitioning the facilities to another buyer or operator, while simultaneously ensuring that patient care remains uninterrupted.

In connection with the Debtors' first-day motions, which sought authorization to use cash collateral and/or obtain debtor-in-possession financing to serve as working capital during the course of the anticipated transactions (the "Bridge Financing"), the Cuarzo Landlords expressed support for the transition of the properties and indicated that they had entered into new go-forward leases with the buyers.

The Cuarzo Landlords, however, previously asserted a concern regarding the Bridge Financing. Specifically, they noted that the Debtors' proposed

budgets, as well as the financing terms offered by the lenders, did not account for the immediate payment of post-petition rent or other charges that would accrue under the *Master Lease* during the period between the petition date and the eventual sale of the facilities. The Cuarzo Landlords argued that such payments should have been provided for in the Bridge Financing budgets pursuant to 11 U.S.C. § 365(d)(3).

In response, the Debtors contended that because the *Master Lease* did not involve "nonresidential property," the Cuarzo Landlords were not entitled to seek immediate payment of rent under 11 U.S.C. § 365(d)(3). The Debtors further argued that any entitlement the Cuarzo Landlords might have to payment should be limited to a right to seek reasonable occupancy charges as an administrative expense under 11 U.S.C. § 503(b), which the Debtors could defer until confirmation of a to-be-filed plan of reorganization under 11 U.S.C. § 1129(a)(9)(B)—presumably to be paid from net proceeds, if any, obtained from a sale of assets or other forms of recovery in these cases.

During the hearing on the Bridge Financing, the Court observed that, despite the limited objection filed by the Cuarzo Landlords, they had not filed a motion seeking immediate payment under any legal theory. The Court also inquired of the Cuarzo Landlords' counsel whether they were objecting to the Bridge Financing on the grounds of lack of "adequate protection" as that term is used in 11 U.S.C. §§ 361-364. In response, the Cuarzo Landlords clarified that they were not objecting to the Bridge Financing on that basis.

The Court then informed the parties that, in the absence of a claim of inadequate protection, the Court would approve the Bridge Financing and that it would be more appropriate to address the § 365(d)(3) issue through a formal contested matter, with motions and responses filed by the interested parties, rather than indirectly in connection with the Bridge Financing.

Subsequently, the Cuarzo Landlords filed the Motion to Compel, which was opposed by the Debtors. An objection was also filed by the Official Committee of Unsecured Creditors. One of the Debtors' lenders, S&T Bank, filed a response. The Court held a hearing on the Motion to Compel on November 6, 2024, and this *Memorandum Opinion* constitutes the Court's findings of fact and conclusions of law with respect to the same pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## II.
## DISCUSSION

### A.

Under 11 U.S.C. § 365(d)(3), a trustee or debtor-in-possession must timely perform post-petition obligations with respect to leases of "nonresidential real property." Thus, by operation of other provisions of the Bankruptcy Code, debtors-in-possession have leeway in terms of performance of payment obligations under a lease for "residential" real property. See e.g. 11 U.S.C. § 503 (administrative claims in bankruptcy).

The timing of payment of lease-based administrative claims was addressed in In re HQ Glob. Holdings, Inc., where the court wrote:

Section 503 provides that an entity can request payment of an administrative expense which may be allowed after notice and a hearing. 11 U.S.C. § 503(a)–(b). Section 503, however, does not address the question of when a claim for administrative expense is to be paid. See, e.g., In re Standard Furniture, 3 B.R. 527, 532 (Bankr. S.D. Cal.1980). The determination of the timing of payment of administrative expenses is a matter within the discretion of the bankruptcy court. See, e.g., In re Colortex Industries, Inc., 19 F.3d 1371, 1384 (11th Cir.1994); In re Verco Industries, 20 B.R. 664, 665 (9th Cir. BAP 1982); In re Baptist Medical Center of New York, Inc., 52 B.R. 417, 421 (E.D.N.Y.1985). In making this determination, one of the chief factors courts consider is bankruptcy's goal of an orderly and equal distribution among creditors and the need to prevent a race to a debtor's assets. Id. Thus, distributions prior to confirmation of a plan are usually disallowed when the estate may not be able to pay all administrative expenses in full. Standard Furniture, 3 B.R. at 532. Other factors include the particular needs of each administrative claimant and the length and expense of the case's administration. See, e.g., In re Reams Broadcasting Corp., 153 B.R. 520, 522 (Bankr. N.D. Ohio 1993); In re Barron, 73 B.R. 812, 814 (Bankr. S.D. Cal.1987).

In re HQ Glob. Holdings, Inc., 282 B.R. 169, 173 (Bankr. D.Del. 2002).

Section 365(d)(3) does not provide a specific definition of the term "nonresidential." Nevertheless, standard dictionary definitions help illuminate its meaning. According to Webster's Third New International Dictionary, "nonresidential" is defined as "not residential." See Webster's Third New International Dictionary 1538 (3rd ed. 2002). The term "residential," in turn, derives from "residence," which is defined as "used, serving, or designed as a residence." Id. at 1931. The most pertinent definitions of "residence" for interpreting the statute include: "the place where one actually lives or has his home as distinguished from his technical domicile," and "a temporary or

permanent dwelling place, abode, or habitation to which one intends to return, as distinguished from a place of temporary sojourn or transient visit." Id.[2]

Skilled nursing facilities and personal care homes clearly fit within this plain and commonly understood meaning of what a "residence" is. The Debtors' patients reside in these facilities for periods far longer than an inconsequential "temporary sojourn or transient visit." These facilities serve a dual purpose: providing necessary healthcare while simultaneously functioning as the patients' place of dwelling and habitation.

Given the plain language of § 365(d)(3), the inquiry should be complete. When the statute is clear, the United States Supreme Court has advised that the "plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" U.S. v. Ron Pair Enters., Inc., 489 U.S. 235, 242 (1989) (alteration in original) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982)).

Nonetheless, with no express definition of the term "nonresidential" in the Bankruptcy Code, courts have held that there is a gap in the statute. Courts addressing this so-called gap have approached it from varied vantage points, employing what they have termed either the "property test" or the "economic

---

[2] The pertinent definitions of "residence" are consistent throughout history, and notably different from the use of the term "domicile." See Black's Law Dictionary 1473 (4th ed. 1968) (defining "residence" as a "factual place of abode" and "living in a particular locality," distinguished by "domicile" which requires intent to make it a fixed and permanent home.); Random House Webster's College Dictionary (2nd ed. 1999) (defining "nonresident" as "not resident at a particular place" and "residence" as "the act of living or staying in a specific place").

test." Compare In re PNW Healthcare Holdings, LLC, 617 B.R. 354 (Bankr. W.D.

Wash. 2020) (following the "property test") to In re Passage Midland Meadows

Operations, LLC, 578 B.R. 367 (Bankr. S.D. W. Va. 2017) (following the

"economic test"). The former looks to the character of the property itself; the

latter considers the contractual intent behind the lease (that is, whether the lease

is for commercial purposes or whether the lease is for non-commercial

purposes).[3] Both tests, while grounded in logic, present limitations when applied

to facilities that serve as both residences and business enterprises.

In this mixed context, to approach the issue as if the *Master Lease* was

"nonresidential" risks overlooking not only the plain language of the statute, but

also the human factual element germane to the leasehold. Though the Debtors'

patients are not tenants in a strict sense under the *Master Lease*, they occupy

the leased premises for the same purposes as any resident— i.e., shelter,

stability, and continuity of care—and the Debtors owe the patients various and

---

[3] Additional cases adopting the "property test" include: In re Independence Village, Inc., 52 B.R. 715 (Bankr. E.D. Mich. 1985) (concluding that a life-care facility for senior citizens was residential because people lived on the property); Sec'y of Army v. Terrace Apts. Ltd. (In re Terrace Apts. Ltd.), 107 B.R. 382 (Bank. N.D. Ga.1989) (concluding that nature of the property is the key factor in determining whether a property is residential); In re Texas Health Enters., Inc., 255 B.R. 181 (Bankr. E.D. Tex. 2000) (concluding that nursing home leases were residential leases); and Alegre v. Michael H. Clement Corp. (In re Michael H. Clement Corp.), 446 B.R. 394 (N.D. Cal. 2011) (applying nature of the property test, which the court believed was the majority view, to determine that property was residential). Cases adopting the "economic test" include: In re Condo. Admin. Servs., Inc., 55 B.R. 792 (Bankr. M.D. Fla. 1985) (concluding a mobile home park lease was nonresidential based on the nature of the lease and not on the use of the property as a residence); Wilson v. Sonora Convalescent Hosp., Inc. (In re Sonora Convalescent Hosp., Inc.), 69 B.R. 134 (Bankr. E.D. Cal. 1986) (noting the commercial intent of the lease is used to determine that property was nonresidential even though patients resided on the property); In re Emory Props., Ltd., 106 B.R. 318 (Bankr. N.D. Ga. 1989) (concluding that a hotel lease was nonresidential based on commercial purpose and common meaning of the term "residential" even though it had permanent residents); and In re Clinton Care Ctr., LLC, 436 B.R. 390 (Bankr. N.D. Miss. 2010) (concluding that § 365(d)(3) applies to nursing home leases).

significant custodial and medical duties under applicable non-bankruptcy law (which are far too varied and complex to list herein).[4] For all intents and purposes, the patients reside at the leased premises; their lives are embedded within the walls of the facilities. An overly simplistic classification of the property as "nonresidential" for bankruptcy purposes thus fails to account for both the plain text of the statute and the broader, essential realities that are attendant to the Debtors' facilities.

**B.**

Should the Court be constrained by precedent to select between the two existing approaches to the perceived gap-filling, the Court finds that the "property test" is more persuasive among the dichotomy of choices presented by the parties. This Court's conclusion in this regard is particularly acute since bankruptcy courts are tasked with a mandate to prioritize substance over mere form, and in this vein should adopt an interpretation of § 365(d)(3) that is aligned with the plain language of the statute and the practical realities at hand.

In the present case, the substance of the arrangement—an occupancy by patients who reside on the premises for care—overwhelmingly favors a residential characterization. As a matter of substance, the totality of circumstances reflects a residential nature of the leasehold property. It is not simply that these individuals inhabit the facilities, but that their presence is integral to the purpose of the lease. In short, the property test, focusing on the

---

[4] For example, residents have admission, transfer, and discharge rights as set forth in 42 C.F.R. § 483.15.

actual use of the premises, provides a more congruent fit with the plain language of the statute.

Several courts have reasoned similarly when confronted with leases involving patient-centered care facilities. In <u>In re Care Givers, Inc.</u>, the court held that the lease of a healthcare facility should be considered residential, given that the patients, though not formal tenants, occupied the space as residents in every meaningful sense. 113 B.R. 263 (Bankr. N.D. Tex. 1989). Additionally, in <u>In re PNW Healthcare Holdings</u>, the court recognized the residential function of long-term healthcare facilities, supporting a broader interpretation of residential use consistent with patient welfare. 617 B.R. 354 (Bankr. W.D. Wash. 2020). These cases reflect a judicial commitment to examining the substance and intended function of the leased premises, particularly in healthcare settings.

## C.

It is this Court's view that neither the "property test" nor the "economic test" provides an entirely satisfactory framework in all cases. The "economic test," by focusing too narrowly on financial purposes of a lease (and without regard to the actual use of the property by the Debtors and their residential patients), undervalues the fact that these facilities are not merely income-producing assets, but rather serve as places of residence for patients within the confines of the premises.

The "property test," on the other hand, may appear apt on its face, yet its scope fails to account for the unique fusion of commercial purpose and personal residency that can arise in some cases. For example, what if a property owner

leased its real property to a tenant for purposes of operating a car dealership? And, what if in this instance the majority shareholder of the dealership (who guaranteed the obligations to the landlord) decided sometime during the tenancy to live in his or her office at the dealership to essentially forego a salary and better enable the dealership to stay afloat? Should, in this instance, the lease be deemed to be a lease of "residential real property" as opposed to "nonresidential real property" since the shareholder is now living at the premises?  Under an overly rigid "property test" the lease in this hypothetical might be deemed residential.  This scenario is not too farfetched as this Court has seen many owners of small businesses do exactly what the hypothetical describes in times of financial crisis.

In short, each test, though cogent in its own sphere, remains incomplete when strictly applied.  Thus, absent mandatory authority on this issue, it is this Court's view that courts should adopt a totality of the circumstances analysis when determining whether a lease is for property that is "nonresidential" or "residential" in nature.

Courts have consistently employed the totality of the circumstances test to interpret and apply terms of art within the Bankruptcy Code, ensuring an appropriate fact-specific analysis consistent with the text of the applicable statute.  For example, in assessing the "good faith" requirement for chapter 13 plan confirmation under 11 U.S.C. § 1325(a)(3), courts have examined the totality of the debtor's financial circumstances, sincerity, and motivations to determine if the plan is being proposed with an honest intention to repay

11

creditors. <u>Kitchens v. Ga. R.R. Bank & Tr. Co. (In re Kitchens)</u>, 702 F.2d 885 (11th Cir. 1983); <u>see also</u> <u>In re Ames</u>, No. 21-12125-ELF, 2022 WL 2195469 at *4 (Bankr. E.D. Pa. June 17, 2022) (citing <u>In re Lilley</u>, 91 F.3d 491, 496 (3d Cir. 1996)).

Courts have also applied a facts and circumstances approach to determine if a debtor qualifies as an "individual with regular income" under 11 U.S.C. § 109(e), analyzing factors such as the stability and reliability of the debtor's income, as seen in <u>In re Antoine</u>, 208 B.R. 17 (Bankr. E.D.N.Y. 1997) and <u>In re Murphy</u>, 226 B.R. 601 (Bankr. M.D. Tenn. 1998).

In the context of determining whether a lease involves "nonresidential" real property under § 365(d) of the Bankruptcy Code, it is similarly appropriate to use the totality of the circumstances test. The nuances of mixed-use properties, such as healthcare facilities that house residents while generating revenue, require a comprehensive assessment that captures the property's purpose, use, and intent. Just as courts have considered a variety of factors to apply statutes in other areas, employing this approach here ensures that the analysis reflects the true nature of the property, consistent with both the statutory language and legislative intent behind § 365. This method allows the courts to balance the rights and obligations of both debtors and landlords, taking into account the economic realities and essential functions served by the leased property.[5]

---

[5] The adage of "one size fits all" does not necessarily apply to the adoption of a "totality of the circumstances" test. <u>See</u> <u>Lee v. U.S. Bank National Association</u>, 102 F.4th 1177 (11th Cir. 2024) (where the test was not favorably reviewed). Some courts have held, in so many words, that adopting such a test should not be done as an excuse for ignoring the plain language of the Bankruptcy Code. <u>See</u>, <u>e.g.</u>, <u>id</u>. at

In evaluating whether a lease involves "nonresidential" real property under § 365 of the Bankruptcy Code, the Court recognizes that no single factor is dispositive. Instead, the analysis must be based on the totality of the circumstances, with a focus on the specific facts and practical realities of each case. The factors considered include but are not limited to: the primary use of the property, the intended purpose as expressed in the lease agreement, the nature of occupancy by residents, applicable regulatory requirements, the economic and commercial aspects of the lease, the relationship between the residents and the property, and, of course, the legislative history and statutory interpretation of § 365.

Applying these factors to the Debtors, several considerations strongly support the conclusion that the *Master Lease* is residential in nature. First, the primary use of the facilities is clearly residential. The properties house approximately 950 residents who rely on the facilities in some instances for around-the-clock care, making these properties function as homes rather than mere commercial enterprises. Second, the lease agreement explicitly

---

1183-86 (criticizing the use of totality tests that "invite judicial discretion to supplant clear statutory commands"). As the court in Lee v. U.S. Bank observed, "The mere incantation of a 'totality of the circumstances' standard should not serve as a smokescreen for courts to depart from the statute's plain meaning." Id. at 1185. The Lee court emphasized that "[w]e are not at liberty to rewrite the statute to reflect a meaning we deem more desirable," cautioning against approaches that "obfuscate clear statutory language." Id. at 1186. This Court does not necessarily quarrel or disagree with the principles articulated in Lee. Rather, *sub judice*, the use of the totality of the circumstances test herein is firmly rooted in the statutory text of § 365(d)(3) and serves to give effect to the multifaceted nature of the term "nonresidential" as used by Congress. The "totality of the circumstances" test adopted herein is not, and should not be construed as, a vehicle to circumvent or undermine the statute's plain language but instead ensures a comprehensive and textually faithful application of § 365(d)(3).

contemplates this residential purpose, describing the facilities as skilled nursing facilities or "primary care homes," and referencing "resident" occupancy throughout, which underscores the expectation that individuals live there for extended periods.[6]

Furthermore, the nature of patient occupancy is residential: individuals reside in these facilities not briefly, but with an extended stay[7] and home-like environment. The relationship between the residents and the property is integral, as the entire business relationship between the Debtors and the Cuarzo Landlords under the *Master Lease* depends on maintaining resident occupancy and providing necessary healthcare services on-site consistent with a myriad of non-bankruptcy law regulations. This dependency emphasizes that the facilities cannot operate in a commercially viable manner without the presence of residents. Finally, while the economic aspects of the lease may involve revenue generation, this factor does not override the fundamental residential use of the property. Taken together, and considering the totality of the circumstances, the leased property aligns with the plain language of § 365(d)(3), warranting the conclusion that the property governed by the *Master Lease* is residential real property for purposes of § 365(d)(3).

---

[6] These were the definitions provided for the "Primary Intended Use" of the facilities, found in Exhibit A and Schedule 2 of the *Master Lease*.

[7] It was represented at the hearing on the Motion to Compel that the duration of stay for residents is "all over the map." See Transcript Regarding Hearing Held 11/06/2024 at 22-23, ECF No. 869.  Residents can stay "either 90 or 120 [days] … [or] for an extended period of time." Id.

**D.**

Turning to the legislative history, Congress, in differentiating leases for "residential real property" from leases for "nonresidential real property," sought to protect landlords from the peculiar vulnerabilities of the commercial retail context. The 1984 amendments to the Bankruptcy Code, which introduced this distinction, principally concerned themselves with retail spaces and similar businesses in shopping centers (leaving residential leases unaddressed) so as to avoid undue hardship upon shopping mall landlords facing bankruptcy upheavals of their tenants. See H.R. Conf. Rep. 98-882 (1984), as reprinted in 1984 U.S.C.C.A.N. 576, 598-99 (titling the section "Shopping Center Bankruptcy Amendments" and noting that the provisions are "intended to remedy serious problems caused [to] shopping centers and their solvent tenants by the administration of the Bankruptcy Code"); see also In re PNW Healthcare Holdings, 617 B.R. at 363 (analyzing the legislative history).

The Debtors' facilities in the instant case are neither shopping centers nor shopping malls, and nothing in the legislative history to the statute gives even a hint of suggestion that Congress was thinking of skilled nursing facilities or personal care homes when they drafted § 365(d)(3). This omission is important, and it is this Court's view that had Congress decided to tackle such a major question within § 365(d)(3), Congress would have stated as much and/or would have defined the term "nonresidential" to include mixed-use properties such as the Debtors' facilities. But Congress did not do so, and it would not be appropriate for this Court to rewrite the statute.

This Court's reluctance to expand the term "nonresidential" to encompass the Debtors' facilities finds further support in the Supreme Court's approach to statutory construction in <u>Harrington v. Purdue Pharma L.P.</u>, 603 U.S. __, 144 S. Ct. 2071 (2024). In that case, Justice Gorsuch declined to broadly interpret the "any other appropriate provision" language in 11 U.S.C. § 1123(b)(6) to authorize non-consensual third-party releases in chapter 11 plans, emphasizing that courts should be cautious in extending statutory provisions absent clear congressional authorization, particularly where such an expansion would impair the interests of vulnerable parties, such as the opioid victims in <u>Purdue Pharma</u>. Similarly, here, interpreting "nonresidential" in § 365(d)(3) to include mixed-use properties like skilled nursing facilities and personal care homes, which Congress did not explicitly contemplate, risks undermining the statutory framework that Congress carefully constructed. As in <u>Purdue Pharma</u>, where the Supreme Court refused to assume that Congress had implicitly authorized an extraordinary remedy, this Court declines to extend § 365(d)(3) to a context that could have significant and unintended consequences, absent explicit legislative guidance.

## E.

Though commercial in part, the Debtors' facilities harbor occupants who are vulnerable and depend upon the facilities for their stability. Thus, a policy mindful of this intent and actual use of the facilities should logically construe healthcare facilities of this kind as "residential," thus safeguarding the continuity necessary for patient welfare.

Classifying residential skilled nursing facilities and primary care homes as residential properties for purposes of § 365(d)(3) has profound societal and public health implications. Residential care facilities serve some of society's most at-risk individuals, for whom continuity of care is paramount. Disruptions in residency for these patients, due to an inflexible application of a non-residential classification, could have serious consequences for public health, particularly in times of economic instability or in the event of a bankruptcy. Recognizing these facilities as "residential" honors the contributions skilled nursing facilities and personal care homes provide with respect to public health and welfare.

The language of the *Master Lease* further lends support to this interpretation. Section 6.3 of the *Master Lease*, requiring the use of the properties as skilled nursing facilities or primary care homes, strongly implies a purpose rooted in a "residence." The emphasis upon patient occupancy and continuity of the primary intended use of the premises, found in Sections 6.5 and 14.4 of the *Master Lease*, suggests that the properties' identity as places of residence is central to the agreement. Indeed, the *Master Lease*'s provisions appear to be geared towards maintaining a residential home care character of the premises, even where economic and business objectives are at play.

## F.

Construing the *Master Lease* as residential, rather than nonresidential, has significant implications for the Debtors' ability to successfully reorganize. Under § 365(d)(3) of the Bankruptcy Code, landlords of nonresidential real property are entitled to immediate payment of all post-petition rent and charges,

which gives them substantial leverage over the debtor. This leverage can be particularly detrimental in the context of a reorganization, as it imposes significant cash flow burdens on the debtor, potentially causing it to divert resources away from critical operational needs (and patient needs), thereby hindering the debtor's ability to stabilize and restructure effectively.

By contrast, treating the *Master Lease* as a residential lease alters this dynamic. A residential landlord is not automatically entitled to immediate rent payments under § 365(d)(3); instead, the landlord may seek an allowed administrative expense for reasonable occupancy charges pursuant to 11 U.S.C. § 503. The payment of such expenses is subject to the bankruptcy court's discretion and may be adjusted based on the debtor's overall financial condition and reorganization needs. This more flexible framework allows the debtor to allocate financial resources strategically and prioritize patient care, staffing, and regulatory compliance, all of which are essential components of running skilled nursing facilities. This flexibility is crucial for maintaining the viability of the facilities, ensuring the continued provision of care to residents, and maximizing the value of the estate for all creditors.

In essence, construing the *Master Lease* as residential facilitates reorganization by reducing the immediate financial pressure on the Debtors, thereby enabling them to craft a more sustainable and effective reorganization plan. It balances the interests of the Cuarzo Landlords with the overarching goal of the Bankruptcy Code: to provide debtors with the opportunity to reorganize

(or sell their operations as a going concern), while preserving and maximizing the value of the estate for the benefit of all stakeholders.

### G.

The analysis of this Court essentially ends where it began—namely, with the plain language of § 365(d)(3) of the Bankruptcy Code, which provides that:

> The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of ***nonresidential*** real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period.

11 U.S.C. § 365(d)(3) (emphasis added).

In interpreting the term "nonresidential" in § 365(d)(3) of the Bankruptcy Code, this Court is guided by the principle that undefined statutory terms be understood according to their ordinary and commonly accepted sense. As articulated by the Supreme Court in <u>Hamilton v. Lanning</u>, "[w]hen a term is not defined in a statute, we typically give the term its ordinary meaning." 560 U.S. 505, 513 (2010).

Courts frequently consult dictionaries to ensure fidelity to this principle, drawing from established sources to discern the common understanding of statutory language. <u>See</u> <u>Id.</u> (consulting dictionaries for the meaning of the term "projected" as used in the Bankruptcy Code); <u>Asgrow Seed Co. v. Winterboer</u>, 513 U.S. 179, 188 (1995) (using dictionaries to determine common meaning of the term "marketing" as used in the Plant Variety Protection Act); and <u>Miller v. Advantage Credit Couns. Serv. (In re Miller)</u>, 336 B.R. 232 (Bankr. W.D. Pa. 2006)

(using dictionaries to determine common meaning of the term "certificate" as used in the Bankruptcy Code).

As set forth above, the dictionary definition of the term "nonresidential" does not comport with the residential nature of the Debtors' facilities. The record supports this conclusion because the properties house approximately 950 residents who live there full-time, relying on these facilities not only for essential healthcare but also for shelter, stability, and community—attributes that are fundamental to any residence.

The *Master Lease* itself underscores this residential character of the real property. The agreement repeatedly references the residents, specifying that the primary intended use of the properties is to serve as skilled nursing or personal care facilities where individuals reside and receive around-the-clock care. The presence of these residents, whose lives are intrinsically tied to these facilities as their homes, aligns with a common understanding of "residential" properties. Thus, under both the plain language of the statute and established dictionary definitions, the Court finds that the Debtors' facilities are appropriately classified as residential, not nonresidential, real property.

**H.**

In interpreting this provision, the Court is mindful of the importance of adhering to the statutory text. Section 365(d)(3)'s focus on the adjective "nonresidential" modifying "real property" rather than modifying the term "lease" underscores a critical distinction: the analysis must prioritize the use and character of the property itself rather than the lease's commercial aspects.

This approach is supported by persuasive authority, such as In re Lippman, 122 B.R. 206 (Bankr. S.D.N.Y. 1990), which examined the similarly phrased provision in § 365(d)(4). The court in Lippman observed that the statute's plain language places emphasis on the nature of the property, concluding that Congress intended to focus on the use of the property rather than simply the nature of the debtor's business. Id. at 210. This interpretation aligns with the principle that statutory text should be read in a way that gives effect to every word, reflecting Congress' intent to address specific property-related concerns rather than general commercial arrangements.

Likewise, in In re PNW Healthcare Holdings, the court reinforced the need to evaluate the intended use of the property under the lease. See 617 B.R. 354. The court held that the master subleases for skilled nursing facilities were residential in nature because they provided housing and long-term care for patients, notwithstanding the commercial aspects of the debtor's operations. Id. at 362-63. The court emphasized that the statutory language requires an examination of how the property functions, thereby favoring an interpretation consistent with its residential use.[8]

## I.

Therefore, guided by the plain language, grammar, and structure of § 365(d)(3), this Court concludes that the Debtors' use of the leased premises for patient residency is consistent with a residential characterization. The statutory

---

[8] Some courts have disagreed with this approach and outcome. See In re Passage, 578 B.R. at 376-81. This Court, however, does not find these decisions persuasive and respectfully declines to follow them.

text, as illuminated by the discussion above, supports this Court's totality-of-the-circumstances approach, ensuring that the substantive reality of the properties' use is not overshadowed by the form of the lease agreement.

A residential characterization of the leasehold such as the one in this case also supports a debtor's ability to craft a feasible reorganization plan. This flexibility benefits not only debtors but also creditors, patients, staff, and other parties in interest (including vendors), aligning with the broader goals of chapter 11, thereby affording skilled nursing facilities in bankruptcy the ability to restructure effectively. It is undeniable that this outcome provides debtors-in-possession with the requisite tools in a bankruptcy setting to provide continued care for vulnerable populations while maximizing value for all stakeholders.

The Cuarzo Landlords obviously do not like this outcome. However, the Court notes that even under a residential classification, the Cuarzo Landlords are not without any Bankruptcy Code-based protections.

For example, § 503(b) grants administrative expense priority for reasonable post-petition occupancy charges, ensuring landlords receive reasonable compensation for a debtor's continued use of the leased space. See 11 U.S.C. § 503(b). Landlords can also seek adequate protection or relief from stay pursuant to 11 U.S.C. § 362(d) if they face significant financial hardship on account of a debtor's continued use of the leased space during the imposition of the automatic stay of 11 U.S.C. § 362(a).[9]

---

[9] The facilities have been sold to a buyer with the consent of the Cuarzo Landlords, thereby mooting any automatic stay issues.

Landlords can seek to compel a debtor to immediately assume or reject a lease pursuant to 11 U.S.C. § 365(d)(2) if the landlord is prejudiced by a debtor's delay in assumption or rejection. Landlords can also seek to terminate the debtor's exclusive right to propose a plan (see 11 U.S.C. § 1121), request that the debtor's privilege of being a debtor-in-possession be revoked and a trustee appointed (see 11 U.S.C. § 1104), and request that the chapter 11 case be converted or dismissed if the debtor engages in bad faith delay that is prejudicial to creditors (see 11 U.S.C. § 1112).  The Court highlights these safeguards because they reflect the Bankruptcy Code's balanced approach, protecting landlords' and other creditors' rights while allowing debtors the opportunity to reorganize in bankruptcy.

**J.**

In rendering this decision, the Court emphasizes that the holding in this *Memorandum Opinion* is confined strictly to the interpretation of the term "nonresidential" as it is used in § 365(d)(3) of the Bankruptcy Code, which is a question of federal law. See Griffel v. Murphy (In re Wegner), 839 F.2d 533, 536 (9th Cir. 1988) (holding that the interpretation of terms within the Bankruptcy Code is a federal question); In re Iron Oak Supply Corp., 169 B.R. 414, 417 (Bankr. E.D. Cal. 1994) (stating that statutory interpretation under the Bankruptcy Code must be resolved under federal law to ensure uniformity).

The Court does not purport to address, nor should this *Memorandum Opinion* be construed to opine on, the appropriate standard for determining which leases for real property are categorized as residential or nonresidential

under other federal statutes (or regulations) or state landlord-tenant law. Furthermore, this decision does not reach the issue of whether occupancy agreements or similar arrangements with patients constitute, or can constitute, leases under applicable non-bankruptcy law. These areas of law are inherently complex and nuanced, involving distinct legal frameworks and various interests that extend well beyond the scope of the matter presently before the Court. As such, any conclusions or implications regarding these other legal questions remain outside the contours of this decision.

### III.
### CONCLUSION

After due consideration, the Court finds that the *Master Lease* does not constitute a "nonresidential" lease within the meaning of § 365(d) of the Bankruptcy Code. Accordingly, the Motion to Compel filed by the Cuarzo Landlords for immediate payment of post-petition rent obligations is denied.

This determination seeks to balance the economic concerns of the Cuarzo Landlords with the legitimate expectations and needs of the Debtors' patients, who, though not conventional tenants, inhabit these facilities in every meaningful sense of the term. This ruling therefore respects both statutory boundaries and the broader humanitarian implications that such cases invariably invoke.

The denial of the Motion to Compel, however, shall be without prejudice to the Cuarzo Landlords' ability to seek allowance and payment of reasonable occupancy charges or administrative rent pursuant to 11 U.S.C. § 503(b). The Court reserves judgment as to the amount, allowability, and timing of payment

of any administrative expense claim that may be due and owing to the Cuarzo

Landlords under § 503(b).

An Order consistent with this *Memorandum Opinion* shall be issued.


Date:  November 14, 2024

_____
The Honorable Jeffery A. Deller
United States Bankruptcy Judge